In the

# United States Court of Appeals

### For the Seventh Circuit

————————

No. 07-1555

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

JAMES L. LESHORE,

*Defendant-Appellant.*

————————

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:05-CR-57-TS—**Theresa L. Springmann**, *Judge.*

————————

ARGUED FEBRUARY 20, 2008—DECIDED SEPTEMBER 11, 2008

————————

Before EASTERBROOK, *Chief Judge*, and BAUER and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* This case illustrates the importance of the standard of review that an appellate court applies to asserted trial error. When an appellant wants to complain about an error for the first time on appeal, we ordinarily require the complaining party to demonstrate plain error. See FED. R. CRIM. P. 52(b). If the challenged ruling is one that we would have reviewed only

for abuse of discretion if a proper complaint had been made in the district court, the appellant's job is especially difficult. That, in a nutshell, is the burden that appellant James LeShore has shouldered here. Finding no reversible error, we affirm his conviction and sentence for bank robbery.

## I

We draw our account of the facts from the district court's opinion, supplementing it with other information as needed. On the morning of September 13, 2005, at about 9:30 a.m., the First Source Bank in Fort Wayne, Indiana, was robbed by two African-American males wearing white cloth masks. One of them brandished a gun. With a bag full of money ($5,600, along with some bait money and a dye pack), the robbers jumped into a blue van and drove away. The van was later found abandoned in a cemetery near a wooded area; its plates were registered to Jeannie Colon and its steering column had been punched. An eyewitness on the other side of the woods saw two African-American men run from the woods into a burgundy truck and drive away. Along the path from the van through the woods to where the eyewitness saw the men jump into the truck, police found a sleeve from a white t-shirt; the rest of the t-shirt was not found.

LeShore does not challenge any of the facts we have recounted thus far. At this point, however, his story diverges from that of the police officers who eventually arrested and questioned him. Officer Fritz Rommel testified that he picked up LeShore in front of a house belong-

ing to Lindsey Green, took LeShore to the police station, and then escorted him into the interview room. Rommel has no particular expertise in recognizing the effects of drugs, but he does have some training in recognizing the effects of alcohol. He stated that LeShore did not stumble, slur his speech, disobey commands, or act strangely. Rommel did not smell alcohol on LeShore's breath. After a 40-minute wait, Special Agent Restituto Loran interviewed LeShore; the interview was recorded on a DVD. Loran did have training in recognizing and dealing with persons under the influence of both alcohol and drugs. Loran testified that he did not notice any signs of intoxication, although he did smell pepper spray (which is common after a dye-pack explosion). Loran gave LeShore a form explaining his *Miranda* rights, and then LeShore read them aloud and signed the form. Loran then questioned LeShore, who recounted that he left his fiancée's house at 10:00 a.m. and found a bag of money already on the back porch of Green's house. LeShore said that he never smoked any crack and was not impaired in any way. After listening to LeShore, Loran and several other officers confronted LeShore with incriminating evidence including statements from Green, surveillance photos from the bank, evidence connecting him to his fiancée's van, and the dye pack. Throughout the interview, LeShore remained attentive and answered questions appropriately.

Before trial, LeShore moved to suppress the statements he made during his interrogation and the associated DVD, alleging that his *Miranda* waiver was invalid because he was heavily intoxicated at the time. At the suppression hearing, LeShore tried to provide a basis for that motion,

expanding on (and changing slightly) his previous narration. He testified that he woke up and left the house of his fiancée, Jeannie Colon, before 8:00 a.m. that morning and headed for a drug house, stealing a bike along the way. He estimated that this trip took him an hour-and-a-half to two hours. At the drug house, he smoked about 2.5 grams of crack and drank four or five beers. He then proceeded to Lindsey Green's house, where he smoked another 1.5 grams of crack, drank several shots of vodka, and cracked open a beer. He claims that he saw a pile of money on the table in Green's house and started to pocket some of it. Green spotted him doing this and kicked him out. He began walking back to the drug house, saw a police car, turned around, and left the money on the back porch of Green's house in a bag. (The last of these details was corroborated by an eyewitness; police discovered some of the bait money from the bank in the bag.) He was arrested in front of Green's house around noon.

The district court found that LeShore's testimony at the suppression hearing was not credible and that he was not impaired when he gave his *Miranda* consent. The court therefore denied his motion to suppress the DVD of the questioning and various inculpatory statements he had made. At trial, LeShore was found guilty and convicted of bank robbery with a dangerous weapon, 18 U.S.C. § 2113(a) & (d), and brandishing a firearm during a crime of violence, 18 U.S.C. § 924(c). He was sentenced to a total of 14 years' imprisonment.

On appeal, LeShore challenges the admission of the DVD of the interrogation and a list of bait money used at the

bank; he also asserts that even if the individual errors are insufficient to warrant a new trial, there is cumulative error that does.

## II

LeShore attacks the admission of the DVD of his interrogation on two grounds: first, that the DVD was unfairly prejudicial and insufficiently probative, warranting exclusion under FED. R. EVID. 403, and second, that he was intoxicated during the interview, which vitiated his *Miranda* consent and rendered the statements he made during questioning inadmissible.

### A. Rule 403 Prejudice

Rule 403 allows the district court to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Ordinarily, we review a district court's evidentiary ruling only for abuse of discretion; when it comes to the necessarily context-sensitive evaluation of a claim under Rule 403, "we give special deference" to the district court's findings and reverse only when "no reasonable person could take the view adopted by the trial court[.]" *United States v. Cash*, 394 F.3d 560, 564 (7th Cir. 2005).

LeShore's position is complicated here, however, by the fact that this objection was never raised at trial, which means he must show plain error. (The Government argues that LeShore did not merely forfeit this argument but

affirmatively waived it. Waiver would extinguish appel-
late review altogether. See *United States v. Murry*, 395
F.3d 712, 717 (7th Cir. 2005). No such waiver occurred,
however. If the pretrial ruling is definitive, as this one
was, no trial objection is necessary to preserve the objec-
tion for review. See *Wilson v. Williams*, 182 F.3d 562, 566
(7th Cir. 1999).) "Before we may correct an error not
raised at trial, we must find (1) that there is error, (2) that
it is plain, and (3) that it affects substantial rights. . . . Once
these three conditions have been met, we may exercise
our discretion to correct the error if it seriously affects
the fairness, integrity, or public reputation of judicial
proceedings." *United States v. James*, 464 F.3d 699, 709 (7th
Cir. 2006) (citation omitted); see generally *United States
v. Olano*, 507 U.S. 725 (1993).

It is here that we must give some force both to the
abuse of discretion standard of review that would have
applied had LeShore made a proper objection and to the
plain error standard that applies to forfeited arguments.
Because LeShore never objected at trial on the grounds he
is now presenting, the district court did not have a
chance to exercise its discretion at all. LeShore therefore
must persuade us that it would have been an abuse of
discretion for the district court to have rejected his
position—indeed, such a serious abuse of discretion that
the plain error standard is satisfied. Given the
special deference paid to a district court's assessment of a
Rule 403 argument, this is an extremely difficult showing
to make. LeShore must essentially show that the evi-
dence was so obviously and egregiously prejudicial that
the trial court should have excluded it even without any

request from the defense, and that no reasonable person could argue for its admissibility.

LeShore's arguments do not pass this high bar. On the issue of the DVD's probativeness, LeShore argues that the video contained no inculpatory statement that could be used for impeachment, because he did not testify at trial. The Government points out, however, that the DVD linked LeShore to some of the evidence from the crime scenes, it corroborated several witness accounts, and it established LeShore's consciousness of his own guilt. These are all reasonable suggestions. LeShore admits on the video that he is left-handed, which matches the description of the gunman provided by eyewitness accounts and shown in the video surveillance films from the bank. LeShore admits on the video that Jeannie Colon is his fiancée, and that admission links him to the van in the surveillance video. In the interview LeShore stated that the van was parked in front of his apartment right before the robbery; this concession weakens the inference that another person stole it and used it in the robbery. The video interview corroborates the testimony of an eyewitness, Green's neighbor, who saw LeShore put a bag on the corner of Green's back porch. Finally, in the interlude before the interview began LeShore checked himself over, which the Government claims shows a consciousness of guilt in light of the exploding dye pack. He also carefully changed his story to place himself at his own apartment when the robbery took place. (The district court found that this story had changed by the time of the suppression hearing.)

LeShore argues that the DVD depicts him in the posture of someone who has already been deemed guilty, and thus it was too prejudicial to use. (Indeed, Special Agent Loran mentioned that they approached this interrogation with LeShore's presumptive guilt in mind—hardly surprising in itself, given the fact that the police had probable cause to arrest him.) The real problem here is not that the police approached their suspect as if he might be guilty; it is that during the course of describing the interrogation, the officer might put impermissible hearsay evidence before the jury. The Government points to other cases allowing mug shots and evidence of prior criminality to be admitted, but all of the evidence in these other cases provided crucial links in the Government's case, such as identification of the defendant. See, *e.g.*, *United States v. Rodriguez*, 925 F.2d 1049, 1054-55 (7th Cir. 1991) (upholding admission of mug shot that provided positive identification); *United States v. Richardson*, 562 F.2d 476, 478-79 (7th Cir. 1977) (affirming admission of photograph and fingerprint card because they identified defendant). To the extent the evidence from the DVD in this case is probative, it is primarily as corroborative material.

Even if LeShore is correct that the DVD did not contain essential evidence, however, it is far from unreasonable to think that it is probative—and certainly not so plainly unreasonable that the district court should have barred the evidence even without a motion. That is enough, under the standard of review that governs here. This is not a situation in which the district court necessarily would have abused its discretion in admitting the evidence, and

thus LeShore's argument fails on the first step of the plain error analysis.

B.   Intoxication and *Miranda* Consent

LeShore also argues that he was intoxicated during the interview recorded on the DVD, and that he was thus in no condition to provide a knowing waiver of his *Miranda* rights. (Once again, the Government urges us to find waiver, but we are satisfied that LeShore did not affirmatively give up this point.) The ultimate question whether a confession was voluntary is one of law, and thus our review of that issue is *de novo. Miller v. Fenton*, 474 U.S. 104, 110 (1985). We examine the totality of the circumstances to assess "whether the defendant's will was overborne," *United States v. Hocking*, 860 F.2d 769, 774 (7th Cir. 1988), and we review factual determinations for clear error. *United States v. Haddon*, 927 F.2d 942, 945 (7th Cir. 1991). "[W]hen the interrogating officers reasonably should have known that a suspect is under the influence of drugs or alcohol, a lesser quantum of coercion may be sufficient to call into question the voluntariness of the confession." *Id.* at 946. In addition, a valid waiver of *Miranda* rights is necessary before a custodial statement may be admitted. *Miranda v. Arizona*, 384 U.S. 436, 476 (1966). A valid waiver must be made knowingly, intelligently, and voluntarily. *Id.* at 444. A valid waiver is necessary but not sufficient for a voluntary statement: a statement may still be found involuntary under the totality of the circumstances even though the waiver was valid. *Baskin v. Clark*, 956 F.2d 142, 145 (7th Cir. 1992).

LeShore runs into problems at the threshold: the district court specifically found that "[LeShore] was not under the influence of any drugs affecting his capacity to understand what was going on or to intelligently assess his situation." This was a simple credibility determination. LeShore said that he had smoked 2.5 grams of crack before going to Green's and had another 1.5 grams with Green. Green admitted that she had taken a hit but not enough to cloud her thinking. Special Agent Loran testified that nothing he saw alerted him to a present state of intoxication during the interview. Loran was not impeached at trial, and LeShore offers no reason why we should second-guess the district court's decision to credit Agent Loran's testimony. The district court was negatively impressed by LeShore because his story changed between the interview and his testimony at the suppression hearing, and he had twice been convicted of false informing. If LeShore was not under any influence that would diminish his capacity, then there is no circumstance that would lead us to question the validity of his *Miranda* waiver, even on *de novo* review.

## III

The second piece of evidence LeShore questions is the list of bait money that was introduced at trial. The term "bait money" refers to a packet of bills the serial numbers of which a bank pre-records. The bank does not circulate the bait money; the only way it leaves the bank is if it is stolen. Thus, if a bill from a bait money list turns up, it was most likely stolen at some point. A bait money list is a

writing offered to prove the truth of the matter as-serted—that the money in evidence was part of a bait money pack. This is classic inadmissible hearsay, FED. R. EVID. 801, unless it can be shown to fall into one of the enumerated exceptions recognized in FED. R. EVID. 803. We review the district court's interpretation of the Federal Rules of Evidence *de novo*, *American Automotive Accessories v. Fishman*, 175 F.3d 534, 540, n.1 (7th Cir. 1999), but we review decisions to admit or exclude evidence for abuse of discretion, *United States v. Robbins*, 197 F.3d 829, 837 (7th Cir. 1999). The Government relied on the business records exception to the hearsay rule, see FED. R. EVID. 803(6), to support admission of the bait money list. The district court accepted that argument and let the list in, and LeShore now asserts that this was error.

A document falls within the business records exception if "1) the acts recorded therein were reported by a person with knowledge, 2) it was the regular practice of the [business] as a regularly conducted business activity to record such acts, 3) the acts were recorded at or near the time of their occurrence, and 4) the documents are properly authenticated unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." *Wheeler v. Sims*, 951 F.2d 796, 802 (7th Cir. 1992) (citations and quotations omitted). The person who testifies to the business record must be the custodian of the documents, the person who compiled them, or "have knowledge of the procedure under which the records were created," *United States v. Wables*, 731 F.2d 440, 449 (7th Cir. 1998).

LeShore's challenge to the bait money list is that even though the bank regularly kept this record, it was irregularly compiled (in this case, remade): a new list was made only after the theft (or loss) of an existing bait money packet. By its very nature, therefore, LeShore argues, a bait money list cannot be regularly compiled. Compilations are generated only when a robber gets away with the old packet. LeShore also challenges whether Melinda Bowmar, a bank employee who testified about the business records, had sufficient personal knowledge to be a credible witness.

This argument overstates the spirit of both the rule and the exception. The chief concern with hearsay evidence is that it lacks sufficient indicia of reliability. Even though the bank did not compile its bait money list regularly, it verified the list three times per year. The Advisory Committee indicated that regular verification is one of the indicia of reliability that gave business records the status of a freestanding exception in the first place. See FED. R. EVID. 803, 1972 Advisory Cmte. Notes, para. 6. Indeed, all of the factors suggested by the Advisory Committee as central to the justification for the exception are met in this case: systematic checking, regularity and continuity (giving rise to precision), actual reliance by the business, and compilation and verification by someone whose duty it is to do so. *Id.*

In this case, Melinda Bowmar, a bank employee, testified that she had personal knowledge of how the list was made, even though she did not put it together herself. It was her job to maintain and verify the bait money list, and she

explained the procedure for creating the list in detail, down to identifying how the bank tracked the money in different tellers' drawers. Her personal knowledge makes her a "qualified witness" within the contemplation of Rule 803(6), and she substantiated the trustworthiness of the bait money list by demonstrating how the business regularly verified all of the serial numbers and relied on the list. Indeed, the list introduced into evidence was the very one used to identify some of the money LeShore was caught with.

We find no legal error in the district court's interpretation of Rule 803 or the business records exception, and no abuse of its discretion to admit the evidence. (We need not discuss LeShore's challenge to the knowledge of another witness, Ann Dennis, as the district court did not rely on her.)

**IV**

Last, LeShore argues that the cumulative error of these rulings infected his trial in a way that no single error did. "The cumulative effect analysis requires a petitioner to establish two elements: (1) at least two errors were committed in the course of the trial; (2) considered together, along with the entire record, the multiple errors so infected the jury's deliberation that they denied the petitioner a fundamentally fair trial." *Alvarez v. Boyd*, 225 F.3d 820, 824 (7th Cir. 2000).

We can reject this argument quickly, because we have found no error to begin with. LeShore cannot show,

furthermore, why the district court's rulings might have affected the outcome of the trial. The DVD corroborates the Government's case, but it was not a central piece of evidence. Had it been excluded, the case would almost certainly have come out the same way. Likewise, the bait money list connects the currency with which LeShore was caught with the money stolen from the bank. But the jury was probably even more impressed by the presence of red dye on his clothes and hands and the surveillance video. Any error in admitting the evidence on which LeShore has focused in his appeal was harmless.

* * *

The judgment of the district court is AFFIRMED.